UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

DERRICK L. BRYANT )
)
v. ) NO. 2:05-CV-187
)
JACK MORGAN, Warden )

# MEMORANDUM OPINION

## I. Introduction

Derrick L. Bryant, a state prisoner who is serving a sentence of life with the possibility of parole, has filed this *pro se* petition for a federal writ of habeas corpus, 28 U.S.C. § 2254, challenging the legality of his confinement under his 1998 Hamblen County, Tennessee murder conviction. The respondent has filed a motion to dismiss, along with the state court record, and the petitioner has responded in opposition. (Docs. 9, 10 and Addenda 1-4, and Doc. 12). For the reasons which follow, the motion will be **GRANTED** and the petition will be **DISMISSED**.

## II. Procedural History

In 1998, the petitioner was convicted of first-degree premeditated murder by a jury verdict in the Criminal Court for Hamblen County, Tennessee. He filed a motion for a new trial and an amended motion for a new trial, both of which were denied. (Add. No. 1, vol. 1).[1]

---

[1] The technical record and transcripts from the trial, filed as Addendum No. 1, are contained in two bound volumes; the new-trial motions and corresponding orders are in Volume 1. Unfortunately, every other page in the first part of Volume 1 has been bound upside down, making the Court's review of the record more difficult.

He then pursued direct review, but was equally unsuccessful in this endeavor. *State v. Bryant*, 2001 WL 1187916 (Tenn.Crim.App. Oct. 9, 2001), *perm. app. denied,* (Tenn. 2002). Next, he filed a petition for post-conviction relief in the trial court. After an evidentiary hearing, his petition was dismissed, and subsequently, Tennessee's appellate courts also denied relief. *Bryant v. State*, 2004 WL 2002463 (Tenn.Crim.App. Sept. 8, 2004), *permission to app. denied,* (Tenn. 2005). He now brings this *pro se* petition for a writ of habeas corpus, raising various grounds for habeas corpus relief.[2]

### III. **Factual Background**

In the early morning hours of February 12, 1998, the petitioner reported a burglary to the Hamblen County Sheriff's Department. After calling in the report, the petitioner met an officer at a local church, explaining that someone had broken into his home, while he and his father were sleeping, and that he had fled the scene, but feared for his father's life. They then proceeded to the Bryant home. Officers entered the home and found the body of the petitioner's father, Randall Bryant ("Mr. Bryant"), lying in bed with a gunshot wound to the back of his head. While sitting in one of the officer's cruiser, the petitioner gave a recorded

---

[2] The structure of the petition made the task of identifying the actual grounds being offered for review quite challenging. The petitioner did not set out his claims in the preprinted form petition, but instead, in a 26-page attachment, titled, "Petition & Memorandum of Law Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254." The first claim in the attachment is a claim of ineffective assistance of counsel, though it is labeled as "Argument." The next section, called "Grounds for Relief," contains additional claims of ineffective assistance, followed by a section entitled, "Second Ground for Relief, in which are alleged a melange of claims, including a claim that his confession violated *Miranda v. Arizona*, 384 U.S. 436 (1966); several more claims of ineffective assistance, on the part of both his trial and appellate lawyers; and claims that certain evidentiary rulings at trial violated his right to due process. For the sake of clarity, the Court has renumbered the claims and grouped together those of the same genre.

2

account of the incident. He had heard someone enter the house, had heard a shot, had seen a masked intruder, had escaped in his father's truck, but had been chased unsuccessfully by the intruder, who was in an automobile. The officers investigating the crime then searched the home and found a nine-millimeter shell casing on the night stand next to the bed; a nine-millimeter bullet on a speaker in the petitioner's bedroom; Mr. Bryant's nine-millimeter handgun permit cut into pieces, resting at the bottom of the commode in the petitioner's bathroom; and a pair of scissors laying on a nearby counter. The nine-millimeter handgun was not found, though another of Mr. Bryant's weapons was located. The petitioner was taken into custody, advised of his *Miranda* rights, and, thereafter, made another statement, in which he admitted the murder:

> When [my girlfriend and I] got [home] my dad walked outside. My girlfriend left. My dad told me to get my ass in the damn garage. He started fussing and took hi[s] belt off ... [and] hit me 3 or 4 times on the back of my thighs. He told me I stole his tools and said I was a damn thief, but I didn't steal his tools. He told me if he caught me on the telephone he was going to beat my ass. I went to my room and shut the door. I was pretty upset. About 30 minutes [passed] and he came back down to my room. He opened the door ... [and] said your [sic] getting another damn beating. He started hitting my back with the buckle end of the belt. He went back upstairs and told me not to come out of my room. This was about 8:00 or 9:00. [Later,] I was thirsty and wanted something to eat. I went upstairs ... and dad was sitting in the recliner. He had one of his guns cleaning it and pointed it at me and told me to get back into my room.... I went back to my room. I heard him later on go to bed. I went back upstairs to get something to drink. He wasn't asleep. He told me to get my GD ass back into my room. I went back to my room again. I waited about 30 minutes until he was asleep and went back upstairs. I went to the back right side bedroom. I got a gun from the gun rack, it was black, it was bigger than a 38, it wasn't the 45 caliber. Dad keeps all his guns loaded, so I didn't have to load it. The gun was one that had a clip in it. I went to his bedroom, the door was shut. I opened it quietly. The lights were off. I went on the right side of the

3

> bed ... and pointed the gun at him but I couldn't shoot it. I was nervous, I was so nervous, I was jerking. He was snoring before I shot him. I panicked and ran out of the bedroom....

*State v. Bryant*, 2001 WL 1187916 *1.

## IV. Discussion

For the sake of clarity, the Court has renumbered and grouped together claims of the same genre.

1. ***Ineffective assistance of counsel.***

The petitioner asserts that, in several instances, his attorney gave him ineffective assistance. The relevant legal rule governing a claim of ineffective assistance is found in *Strickland v. Washington*, 466 U.S. 668 (1984). To establish such a claim, a petitioner must show that counsel's performance was deficient and that the deficient performance prejudiced the defense so as to render the trial unfair and the result unreliable. *Id.*, at 687. A reviewing court's scrutiny of counsel's performance is highly deferential. *Id.*, at 694. To demonstrate deficient performance, a petitioner must show that his counsel's representation fell below an objective standard of reasonableness on the facts of the particular case, viewed as of the time of counsel's conduct. *Id.* at 688, 693-94. To show prejudice, a petitioner must demonstrate that there is a reasonable probability, but for counsel's unprofessional errors, the result of the proceeding would have been different *Id.* at 694. A finding of no prejudice provides an adequate ground for rejecting an ineffective assistance of counsel claim, even if a deficient

performance is assumed. *Id.*, at 687. The claimed attorney errors will be discussed individually.

   a. *Counsel failed to obtain a forensic evaluation in connection with the transfer hearing*: The petitioner alleges that, after he was charged with the murder, Greg W. Eichelman, an attorney with the public defender's office, was appointed to represent him. A petition of delinquency was filed and a hearing was set to determine whether the petitioner should be tried as an adult. The petitioner alleges that, even though he had a long history of mental retardation; was functioning academically far below his age group; and had a mental capacity of an 8- to 10-year old child, his retained attorney, Mark Stapleton, who by this time had replaced Mr. Eichelman, chose to offer testimony at the transfer hearing of two school-employee witnesses. This was an error because, while those witnesses were familiar with the petitioner's performance on academic tests, they simply were not qualified to testify as the statutory factors bearing on the transfer determination.[3] The petitioner alleges that Mr. Stapleton's failure to secure the testimony of a qualified witness to speak to any past efforts to treat the petitioner or to his potential for rehabilitation constituted ineffective assistance.

---

[3] Under Tennessee law, certain prerequisites must be satisfied before a minor, who is the subject of a delinquency petition, can be tried as an adult. The minor must be at least sixteen years old at the time of the alleged offense (or less than 16 for certain charges, including first-degree murder); the minor must be afforded a hearing to determine whether jurisdiction should be transferred from juvenile court to criminal court; and the juvenile court must make certain findings, including that there are reasonable grounds to belief that the minor committed the delinquent act as alleged; that he was not committable to an institution for the mentally retarded or mentally ill; and that the interests of the community require him to be placed under legal restraint or discipline. Tenn. Code Ann. § 37-1-134(a) (Supp. 2000). Other considerations include the youth's prior delinquency records; past efforts to treat the youth and any response to treatment; the type and nature of the offense; and the possibility that the youth could be rehabilitated using currently available resources. Id., § 37-1-134(b).

5

This alleged failure, according to the petitioner, is even more notable, given that Mr. Stapleton's predecessor had proposed to obtain, as an expert witness, one Dr. Schacht, a psychologist. The Court infers that the petitioner is alleging that Dr. Schacht would have been asked to testify and would have been qualified to testify about issues relevant to the transfer determination.

The claim was raised in the post-conviction petition. At the evidentiary hearing, Attorney Stapleton testified that he knew about the petitioner's history of psychological problems, alleged child abuse, and IQ scores of 68-72, which indicated that his client had mild mental retardation. Mr. Stapleton also stated that, prior to the transfer hearing, he had had a competency evaluation performed on the petitioner to determine whether a diminished capacity defense could be developed, and that the mental health expert who conducted the evaluation had reported that, in his opinion, the petitioner was competent, able to assist in his defense, and, essentially, not committable to a mental institution. Mr. Stapleton added that he had interviewed teachers and counselors who had contact with the petitioner; had spoken with other individuals who could review the petitioner's history and offer opinions about his mental state; had discussed the case with a forensic psychologist and author of a book titled "Kids Who Kill," who had responded that her testimony would not be favorable to the defense; had spoken to another person who had given a similar response; and had obtained a court order for a mental evaluation. Mr. Stapleton also testified that he had been unable

6

to arrange for the evaluation prior to trial or obtain a continuance and that, thus, he had proceeded to trial without an evaluation.

In addressing this alleged attorney error, the trial court noted that, while it had authorized Dr. Schacht to perform a psychological assessment of the petitioner, Dr. Schacht had not testified at the evidentiary hearing. (Post-conviction counsel responded that Dr. Schacht's "evaluation was very little help." (Evidentiary Hr'g T. at 19). Concluding that the petitioner had shown neither a deficient performance on the part of his attorney or any resulting prejudice, the post-conviction court dismissed this claim of ineffective assistance.

The claim was also offered during the petitioner's post-conviction appeal. The Court of Criminal Appeals first cited to the test articulated in *Strickland* for evaluating ineffective assistance claims and then referenced the statutory factors to be applied by a juvenile court in determining whether a transfer is warranted. It then determined that:

> [t]he [petitioner] offered no expert proof at the post-conviction hearing that establishes that he was committable to an institution for the mentally retarded or mentally ill; that the nature of past treatment efforts and his response thereto weighed in favor of retention; or that his potential for rehabilitation was such that retention should have been ordered. In other words, the [petitioner] has offered no proof in this proceeding that, through additional diligence, his lawyers could have convinced the juvenile court to retain jurisdiction and deny the State's motion to transfer the [petitioner] to be tried as an adult. Accordingly, the [petitioner] has failed to prove prejudice in this regard and his claim of ineffective assistance of counsel on this ground was therefore properly denied by the trial court. This issue is without merit.

*Bryant*, 2004 WL 2002463, at *2.

A district court may not grant a writ of habeas corpus for any claim adjudicated on the merits in state court unless the adjudication resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. 28 U.S.C. § 2254(d). Moreover, findings of fact made by a state court are presumed correct unless the petitioner shows by clear and convincing evidence that those findings were erroneous. 28 U.S.C. § 2254(e)(1). This statutory presumption encompasses factual findings made by a state appellate court on the basis of its review of trial court records. *Brumley v. Winard*, 269 F.3d 629, 637 (6th Cir. 2001).

The state court's finding of fact that the petitioner presented no proof on the issue of prejudice is presumed correct absent clear and convincing evidence to the contrary. Absent evidence to demonstrate prejudice, a claim of ineffectiveness cannot succeed. *See Strickland*, 466 U.S. at 687. This Court is satisfied that the state court's resolution of this claim was not an unreasonable application of the *Strickland* standard nor based on an unreasonable determination of the facts. Since the petitioner's claim of ineffective assistance does not pass either of § 2254(d)'s tests, it will be dismissed.

b. *Counsel failed to obtain a forensic evaluation in connection with the trial*. In this example of alleged ineffective assistance, the petitioner contends that Attorney Stapleton advanced defenses of diminished capacity and battered-child syndrome—defenses which

8

could only be substantiated by expert psychiatric testimony. However, though counsel had seven months in which to obtain an psychiatric expert, he offered no such an expert witness at trial. According to the petitioner, counsel's lack of diligence in this respect is illustrated by his closing argument that "Dr. Panella came fort[h], I didn't hire him, because I was in a situation where I had to scramble. I didn't tell him what to look for when he looked."[4]

This claim likewise was addressed by the Court of Criminal Appeals, which found that the claim failed for a lack of proof, since the petitioner had not presented any expert testimony to show that a forensic evaluation would have benefitted him. The appellate court also pointed out that the petitioner's trial attorney had testified that he had spoken with several mental health experts; that none of them had given helpful advice; and that the results of the one evaluation performed on the petitioner to determine his competency to stand trial and ability to assist in his own defense did not help the petitioner either. Concluding that the petitioner had failed to show any prejudice flowing from his lawyer's alleged deficiency, the appellate court refused to grant relief on this claim.

As noted, the factual determinations of state courts are presumed to be correct and the petitioner has the burden of rebutting this presumption with clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1). The petitioner has submitted no such proof to refute the state court's factual finding that he did not offer expert testimony showing how he would have benefitted from a forensic examination.

---

[4] Dr. John Panella, a witness for the defense, testified at trial as to the petitioner's level of intellectual functioning and his IQ scores.

To succeed on a claim of ineffective assistance, a petitioner must establish that, absent counsel's alleged error, there is a reasonable probability that the outcome would have been different. *See Strickland*, 466 U.S. at 694. Since the petitioner did not demonstrate a reasonable probability of a different outcome had Mr. Stapleton procured such an evaluation, the state appellate court reasonably determined that the petitioner had not established prejudice under *Strickland* and that counsel had not rendered ineffective assistance.

    c. *Counsel made several errors in connection with the detention and preliminary hearings and on appeal.* The petitioner maintains that Clifton Barnes, another attorney with the public defender's office who assisted Mr. Eichelman, waived a detention hearing, without his consent, and also waived a preliminary hearing, without advising him, insofar as he can recall, of the consequences of such a waiver. He further contends that because of the waiver, he lost the opportunity to discover, confront, and cross-examine witnesses; preserve testimony for later use; and obtain firsthand knowledge of the prosecution's case so that he could prepare his defense, investigate the case, find favorable witnesses and, possibly, uncover information to assist him in avoiding a transfer to criminal court. The petitioner also faults the failure [on the part of the court?] to hold an evidentiary hearing to determine why counsel was waiving the hearing. Finally, he charges that Attorney Barnes, who was appointed to represent the petitioner after Mr. Stapleton withdrew, gave him ineffective assistance on appeal. The respondent argues that these claims were not exhausted and are now procedurally defaulted.

10

The law is settled that if a petitioner fails to exhaust his claim by presenting it to the state courts in a manner prescribed by state procedural rules, and if he is now barred from doing so, a federal court will not review his claims, unless he shows both cause to excuse his failure and actual prejudice to him at trial or on appeal. *See Coleman v. Thompson*, 501 U.S. 722, 750 (1991). Absent a showing of cause and prejudice, a petitioner may still obtain review if he establishes that the failure to review his claim will result in a miscarriage of justice, *id.*, such as when he makes a colorable showing that a constitutional error has probably resulted in the conviction of a person who is actually innocent of the crime. *See Schlup v. Delo*, 513 U.S. 298, 314-15 (1995).

These issues were presented in the post-conviction court, but were not carried to the Court of Criminal Appeals. [Add. No. 3]. Thus, since they were not preserved for federal review, *O'Sullivan v. Boerckel*, 526 U.S. 838, 845-47 (1999), and since the petitioner has not shown cause and prejudice, they are now procedurally defaulted. And though the petitioner claims to be actually innocent, there are no allegations of fact to support the claim. Furthermore, because of his confession to having killed his father, there has been no fundamental miscarriage of justice and no wrongful conviction of an innocent man. *See Bousley v. United States*, 523 U.S. 614, 623 (1998) (defining "actual innocence" as factual innocence, not mere legal insufficiency) (citing *Schlup*, 513 U.S. at 327-28).

    d. *Counsel failed to make an offer of proof.* The petitioner contends that his trial attorney failed to make a proffer of proof to show the admissibility of evidence of his father's

violent propensities. Had this been done, according to the petitioner, it would have provided a record for appeal and, perhaps, would have supported a theory of "first aggressor." The respondent argues that this claim has been procedurally defaulted and the Court so finds.

On direct appeal, the petitioner attributed the error to the *trial court*, claiming that it had erred by excluding testimony concerning Mr. Bryant's reputation for violence. Pointing to the petitioner's acknowledgment that testimony about his father's violent and aggressive behavior had been admitted, the state appellate court found that the alleged court error had been waived due to the petitioner's failure to furnish supporting argument, to cite to authority or to cite to the record.

This issue was not raised as an ineffectiveness claim in the Court of Criminal Appeals, though it was offered in the post-conviction petition. (Add. No. 3 and 4). Therefore, whether raised as trial error or attorney error, the petitioner's failure to raise this claim in accordance with state requirements on direct review or during post-conviction appellate review constitutes a procedural default which renders federal review unavailable. *See Boerckel*, 526 U.S. at 845-47; *Wainwright v. Sykes*, 433 U.S. 72, 87-88 (1977).

### 2. *Right to a detention hearing.*

The petitioner alleges that he was not afforded a detention hearing, in violation of his statutory right to one. The respondent views this claim as an allegation that the petitioner was denied an acceptance hearing after his transfer to criminal court and, citing to the opinion of the state appellate court on direct review, argues that, as a matter of state law, the

12

Case 2:05-cv-00187 Document 15 Filed 09/06/06 Page 12 of 18 PageID #: 12

petitioner was not entitled to an acceptance hearing.  However, the Court reads the claim as exactly as it was worded in the petitioner's pleading: as a contention that the petitioner was denied his statutory right to a detention hearing.  (Doc. 1, Pet. & Mem., at 9-11).

Under Tennessee juvenile law, a detention hearing is a preliminary hearing at which a court must determine, among other things, whether there is probable cause to believe that a juvenile committed the charged offense and whether his detention is warranted.  *See State v. Carroll*, 36 S.W.3d 854, 863 (Tenn. Crim. App. 1999), *perm. to appeal denied*, (Tenn. 2000) (citing to Tenn.Code. Ann. § 37-1-114 and Tenn. R. Juv. P. 15(b)).  This issue has no merit since the record shows that the petitioner, through his attorney, waived a detention hearing.  (Add. No. 2, vol. 1, Judge Seals' Order of Feb. 17, 1998).  Also, the issue was not raised on appeal and, therefore, has been procedurally defaulted.  Furthermore, to the extent that the petitioner is reiterating his claim that counsel gave him ineffective assistance by waiving a detention hearing, that claim has already been found to have been procedurally defaulted.

### 3. *Hearsay testimony*.

In this claim, the petitioner asserts that the prosecution's theory of "murder for gain" was supported by hearsay testimony, which was admitted even though it lacked indicia of reliability and violated state law and his constitutional right to confront his accusers.  This issue was not raised in the petitioner's motion for a new trial, his amended motion for a new trial,  his brief on direct appeal in the Court of Criminal Appeals, or in his application for

permission to appeal in the Tennessee Supreme Court. This constitutes a procedural default, for which no cause and prejudice has been alleged. Federal review is now barred.

### 4. *Statement taken in violation of Miranda.*

This issue involves the trial court's refusal to suppress the petitioner's statements given to law enforcement officials. Shortly after the murder, the officer who was investigating the crime recorded his interview with the petitioner as they sat in a patrol car parked at the Bryant home. In this statement, the petitioner related that he had heard someone enter the house, walk around upstairs, and enter his father's room; that he had then heard a shot; that, after seeing someone in a black mask running, he had fled in his father's truck; and that he had been chased by the intruder in a car, but had managed to evade his pursuer(s). (Add. No. 2, vol. 1, Trial Exh. 3). The second statement was written and was obtained some three and a half hours later, after the petitioner had been read his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), and after he had executed a written waiver of his constitutional rights. The petitioner claims that his waiver and his statements were not voluntary, knowing, and intelligent because he was not competent to waive his rights, given his lack of mental ability to understand the consequences of such a waiver. Further, he claims that the statements were taken in violation of his right to counsel and state law.

The trial court concluded, after a hearing on the petitioner's motions to suppress, that the petitioner knowingly and understandingly had waived his *Miranda* rights and had voluntarily confessed. The taped statement and the confession were admitted at trial.

14

The admission of the first statement was not attacked on appeal and, as discussed, the petitioner's failure to raise this issue on appeal constitutes a procedural default, absent cause and prejudice, neither of which has been alleged or shown. Moreover, during the suppression hearing, the petitioner, through his trial counsel, stipulated to the admissibility of his taped statement. (Add. No. 2, vol. II, Motions Hr'g Tr., at 111).

The petitioner did raise his challenge to the admission of the second statement in the Court of Criminal Appeals during his direct review. He argued that his *Miranda* rights were not explained to him in language that he—a mentally retarded person—could understand. The appellate court found that, under the totality of circumstances, he was able "to understand the implications of a waiver" and that the record supported that the confession was knowing and voluntary.

The rule articulated in *Miranda v. Arizona*, 384 U.S. 436 (1966), requires law enforcement officers to advise a suspect during custodial interrogation that "he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has the right to the presence of an attorney, either retained or appointed." *Id.,* at 444. The remedy for a *Miranda* violation is the exclusion, during the prosecution's case-in-chief, of the statement stemming from the custodial interrogation. *Id.*, 384 U.S. at 444.

However, a defendant validly may waive his constitutional rights if he does so voluntarily, knowingly, and intelligently. *Ibid.* To be voluntary, the waiver must be a free

15

and deliberate choice, made with full consciousness of the nature of the right being waived and the consequences attendant to the waiver. *Moran v. Burbine*, 475 U.S. 412, 421 (1986).

By the same token, a defendant may waive his privilege against self-incrimination and confess to a crime and that confession, so long as it is voluntary, may be admitted at trial. *Colorado v. Connelly*, 479 U.S. 157, 163-64 (1986). Whether a confession is voluntary depends upon the "totality of circumstances" surrounding the confession. *See, e.g., Greenwald v. Wisconsin*, 390 U.S. 519, 520-521 (1968).

Among the factors to be considered are the age, education, and intelligence of the accused; whether the accused has been informed of his constitutional rights; the length of the questioning; the repeated and prolonged nature of the questioning; the use of physical punishment, such as the deprivation of food or sleep, *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973); the use of fear and humiliation, *see Malinski v. New York*, 324 U.S. 401, 407 (1945), threats, trickery, or cajolery, or holding a suspect incommunicado. *Miranda*, 384 U.S. at 455-58.

There is no question that *Miranda* provides the Supreme Court precedent for resolution of this claim, *see Dickerson v. United States*, 530 U.S. 428, 432 (2000) (holding that *Miranda* and its progeny "govern the admissibility of statements made during custodial interrogation in both state and federal courts"), and no question that the Tennessee Court of Criminal Appeals identified *Miranda*, among other cases, as containing the legal principles

16

upon which it based its decision. Clearly, the decision is not contrary to the well established governing law in Supreme Court cases.

The question is whether the appellate court unreasonably applied the principles in *Miranda* and its progeny to the facts of the petitioner's case. It did not.

The Court of Criminal Appeals related that, while testing results signaled that the petitioner was mildly mentally retarded, the totality of the circumstances indicated that he could understand the implications of a waiver. It pointed out that the trial judge, after hearing the tape recording of the first statement, had determined that the defendant understood the statements he signed; that the petitioner's own expert held the same opinionl and that the expert also believed that the petitioner would have understood his confession when it was read back to him. It also pointed to evidence that the petitioner had completed eleventh grade; had possessed a valid driver's license; had been employed as a construction worker; and had had prior encounters with the criminal justice system. Indeed, apropos of the petitioner's past juvenile criminal proceedings, it also cited with approval, the trial court's observation that "the essence of [the *Miranda* rights read to the defendant could] be easily gained."

Though acknowledging that mental deficiency of a certain magnitude might render a person unable to make a knowing and intelligent waiver, the appellate court obviously did not find the petitioner's level of intellectual functioning to place him in this category, but, instead considered the petitioner's mental retardation as one circumstance among many

17

factors, before concluding that the record supported that the petitioner's confession was knowingly and voluntarily given.

The state appellate court's decision that, under the totality of circumstances, the petitioner's confession was voluntary and knowing and, thus, was admissible did not result from an unreasonable application of the relevant principles in the *Miranda* line of cases. A writ of habeas corpus will not issue with respect to this claim.

## IV. Conclusion

Accordingly, the respondent's motion to dismiss (Doc. 9), will be **GRANTED**, and this petition will be **DISMISSED**.

Finally, the Court must decide whether to issue a certificate of appealability (COA). The petitioner qualifies for issuance of a COA if he has made a substantial showing of the denial of a constitutional right; he makes such a showing by demonstrating that reasonable jurists might question the correctness of the Court's procedural ruling or its assessment of his constitutional claims. *See Slack v. McDaniel,* 529 U.S. 473 (2000). In view of the rationale for dismissing his claims, the Court finds that jurists of reason would debate neither its procedural rulings or its evaluation of the claims. A COA will not issue.

ENTER:

                                            s/ Leon Jordan
                                      United States District Judge